IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CENTEX CONSTRUCTION,            )
                                )
          Plaintiff,            )
                                )
     v.                         )      1:06cv54(JCC)
                                )
ACSTAR INSURANCE CO. and        )
ACCUTRONICS DATACOM, INC.       )
                                )
          Defendants.           )

## M E M O R A N D U M   O P I N I O N

This matter comes before the Court primarily on the
parties' cross-motions for partial summary judgment and
Defendants' supplemental motions for summary judgment.  In
addition to these motions, the parties have raised several
ancillary matters, including cross-motions to strike various
materials relied upon the motions for partial summary judgment,
Defendants' motion for leave to withdraw and/or amend their
admissions, Defendants' motion for leave to file supplemental
motions for summary judgment, and Defendant Accutronics' motion
for leave to file a second amended answer and counterclaim.  For
the following reasons, the Court will grant Defendants' motion
for leave to file supplemental motions for summary judgment, deny
Defendants' supplemental motions for summary judgment, deny
Defendants' motion for leave to withdraw and/or amend their
admissions, deny Defendant Accutronics' motion for leave to file
a second amended answer and counterclaim, grant Plaintiff's

motion for partial summary judgment in part and deny it in part, deny Defendants' motion for partial summary judgment, grant Plaintiff's motion to strike in part and deny it in part, and deny Defendants' cross-motion to strike.

## I.  Background

Plaintiff, Centex Construction, LLC ("Centex"), has brought this action against Defendants, ACSTAR Insurance Company ("ACSTAR") and Accutronics Datacom, Inc. ("Accutronics"), seeking a declaratory judgment and damages for the alleged breach of a payment bond, performance bond, and subcontract.  On January 30, 2003, Centex entered into a contract (the "Prime Contract") with the federal government for the construction of a project known as the Defense Threat Reduction Center in Fort Belvoir, Virginia (the "Project").  Travelers Casualty and Surety Company of America ("Travelers") issued a payment bond and performance bond on behalf of Centex and in favor of the United States.  On June 24, 2003, Centex entered into a written subcontract (the "Subcontract") with Accutronics, in which Accutronics agreed to furnish labor, services, materials, and the like to perform the telecommunications system work for the Project.

The original price of the Subcontract was $170,200.00, "subject to additions and deductions for changes in the work as may be agreed upon."  (Pl.'s Mot. for Partial Summ. J., Ex. 1-B, at 1.)  The Subcontract also provided for, at Centex's option and

direction, the addition of certain enumerated "Options" to
Accutronics' scope of work.  The Subcontract enumerated seven
Options, including, *inter alia*, an Option for installation of
telecommunications and data cabling for the lump sum amount of
$1,500,626.00, an amount priced by Accutronics.

The Subcontract's General Conditions section included
language controlling changes to the Subcontract.  It provided
that "[t]he Contractor may at any time, unilaterally or by
agreement with Subcontract, without notice to the Sureties make
changes in the Work covered by this Subcontract."  (*Id.*, Ex. 1-B,
General Conditions, ¶ 11(A)(1).)  The General Conditions section
also stated:

> No change, alteration or modification in or deviations
> from this Agreement or the Contract Documents shall
> release or exonerate in whole or in part any Surety on
> any bond given in connection with this Agreement.
> Neither Owner nor Contractor shall be under any
> obligation to notify the Surety or Sureties of any such
> change.  Any increase in the Subcontract amount shall
> automatically result in a corresponding increase in the
> penal amount of the bonds without notice to or consent
> from the Surety, such notice and consent being hereby
> waived.  Decreases in the Subcontract amount shall not,
> however, reduce the penal amount of the bonds unless
> specifically provided in any Change Order decreasing the
> Scope of the Work.

(*Id.*, Ex 1-B, General Conditions, ¶ 5(A)(2).)

The Subcontract required Accutronics to obtain a
payment bond and a performance bond in accordance with the forms
attached as Exhibit E to the Subcontract.  The Subcontract also
required Accutronics and its surety to agree to indemnify and

-3-

hold Centex harmless from all claims, demands, losses, and causes of action arising from Accutronics' failure to perform its obligations under the Subcontract.  Similar language in the Subcontract required Accutronics and its surety to indemnify and hold Centex harmless against all liability for claims and liens for labor performed or materials used or furnished through or under Accutronics for the Project.

On October 9, 2003, ACSTAR, as surety, issued a payment bond (the "Payment Bond") and a performance bond (the "Performance Bond") on behalf of Accutronics, as principal, and in favor of Centex, as obligee.  Both the Payment Bond and the Performance Bond expressly incorporated the Subcontract by reference, making the Subcontract "a part [t]hereof for all purposes."  (*See id.*, Ex. 1-C; Ex. 1-D.)  Both Bonds provided for joint and several liability between Accutronics and ACSTAR.  The Bonds were issued for the sum of $170,200.00, but both also provided:

> [A]ny increase in the Subcontract amount shall automatically result in a corresponding increase in the penal amount of the bond without notice to or consent from the Surety, such notice and consent hereby being waived.  Decreases in the Subcontract amount shall not, however, reduce the penal amount of the Bond unless specifically provided in said Change Order.

(*Id.*, Ex. 1-C; Ex. 1-D.)

The Bonds also provided:

> [A]ny alterations which may be made in the terms of the Subcontract or in the work to be done under it, or the

-4-

giving by the General Contractor of any extension of time
for the performance of the Subcontract, or any other
forbearance on the part of either the General Contractor
or the Subcontractor to the other shall not in any way
release the Subcontractor and the Surety, or either of
them . . . from their liability hereunder, notice to the
Surety of any such alteration, extension or forbearance
being hereby waived.

(*Id.*, Ex. 1-C; Ex. 1-D.)

During the course of the Project, Centex and
Accutronics executed eight additive change orders to the
Subcontract, in the aggregate amount of $2,406,812.00.[1]  The
Subcontract required Accutronics to pay "any additional premiums
due because of change orders and [to] include such costs in its
change order proposals."  (*Id.*, Ex 1-B, General Conditions,
¶ 5(A)(4).  Pursuant to this provision, Accutronics' proposals
for several of the change orders included amounts allocated for
bond premiums.

On multiple occasions, Centex notified Accutronics and
ACSTAR that Accutronics was in default of its Subcontract
obligations for, among other things, failure to perform certain
obligations and failure to pay for labor, materials, equipment,
supplies, services, and the like, used or reasonably required for
use to perform the Subcontract.  Multiple claimants have made
demand on or asserted claims against Centex, Travelers, or both
for amounts allegedly unpaid by Accutronics for labor, materials,

---

[1]The majority of this amount resulted from Change Order One, which
provided for installation of telecommunications and data cabling for the
amount of $1,500,626.00.

equipment, supplies, services, and the like, provided to
Accutronics for its work under the Subcontract.  Centex tendered
defense of the claims and demands to ACSTAR, but ACSTAR rejected
the tender and has refused to hold Centex and Travelers harmless
from these claims.  Neither ACSTAR nor Accutronics has tendered
any amount to Centex in defense of the aforementioned claims and
demands.

On January 17, 2006, Centex filed a six-count complaint
in this Court alleging, *inter alia*, breaches of the Subcontract,
the Payment Bond, and the Performance Bond.  Count I of Centex's
complaint seeks a judgment declaring that the penal sums of the
Payment Bond and Performance bond are currently at least
$2,577,012.00.  Count I also seeks a judgment declaring that
ACSTAR and Accutronics have a duty to defend, indemnify, and hold
Centex and Travelers harmless from claims and demands asserted
against either of them by unpaid claimants that provided labor or
material to Accutronics, up to at least the penal sum of the
Payment Bond and Performance Bond.

On May 9, 2006, Centex filed a motion for partial
summary judgment, seeking the declaratory judgment requested in
Count I.  On May 22, 2006, Defendants filed a cross-motion for
partial summary judgment on Count I.  The parties subsequently
filed a number of motions seeking relief that is ancillary and
related to the partial summary judgment motions.  On June 26,

-6-

2006, Defendants both filed separate supplemental motions for summary judgment, which seek dismissal of Centex's claims in their entirety.  These motions are currently before the Court.

## II.  Standard of Review

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of fact exists if a reasonable jury could return a verdict for a nonmoving party.  *See id.*  In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict.  *See id.*  As the Fourth Circuit explained,

we must draw any permissible inference from the
underlying facts in the light most favorable to the party
opposing the motion.  Summary judgment is appropriate
only where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party,
such as where the non-moving party has failed to make a
sufficient showing on an essential element of the case
that the non-moving party has the burden to prove.

*Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992) (internal

citations omitted), *abrogated on other grounds in Hazen Paper Co.*

*v. Biggins*, 507 U.S. 604 (1993).

### III.  Analysis

A.  Centex's Delegation of Duties to Dynalectric

1.  Defendants' Supplemental Motions for Summary Judgment

Centex's subcontractor for electrical work on the

Project was Dynalectric Company ("Dynalectric").  On October 27,

2003, Centex issued Change Order Number 0007 to its subcontract

with Dynalectric, and Dynalectric executed the Change Order on

November 5, 2003.  Change Order Number 0007 provided for a

deduction of $170,200.00 from Centex's subcontract with

Dynalectric and stated as follows:

[Dynalectric] agrees to accept assignment of the Separate
Subcontract issued by Centex to [Accutronics] bearing a
date of June 24, 2003 and agrees to accept and assume all
obligations and responsibilities to [Accutronics] that
Centex had under said Subcontract. [Dynalectric] agrees
to review all shop drawings, payment requests and change
order requests by [Accutronics].  [Dynalectric] will be
responsible for any claims, schedule delays or
performance of work issues associated with or caused by
[Accutronics].

(ACSTAR's Suppl. Mot. for Summ. J., Ex. 12.)

Relying on the above language, Defendants argue that Change Order Number 0007 constituted a complete assignment of the Accutronics Subcontract from Centex to Dynalectric. Defendants note that an assignment divests the assignor of its rights or interest in the subject matter of the assignment. *See, e.g.*, Restatement (Second) of Contracts § 317(1) (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."). Thus, Defendants contend that Centex was no longer a party to the Accutronics Subcontract after November 5, 2003.

Centex issued the first of its additive change orders to the Accutronics Subcontract on January 19, 2004, and Accutronics executed this change order on January 26, 2004. Relying on the purported assignment, Defendants argue that Centex was no longer a party to the Accutronics Subcontract at the time and thus had no right or ability to execute change orders under the Subcontract. Because none of the change orders were executed by Dynalectric, the purported assignee of the Subcontract, Defendants argue that the change orders are legal nullities and could not have increased the Subcontract amount or the consequent obligations under the Payment Bond or the Performance Bond. *See, e.g.*, *Capps v. Capps*, 219 S.E.2d 901, 903 (Va. 1975) (stating the

-9-

general proposition that a contract requires "absolute mutuality
of engagement, so that each party has the right to hold the other
to a positive agreement").  The Court disagrees.

Generally, where the circumstances of a transaction
demonstrate an intent to effect an assignment, Virginia law will
presume the assignment to be complete in nature and scope in the
absence of express limitations on the rights and duties to be
assigned.  *See Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.,
III*, 521 S.E.2d 761, 763-64 (Va. 1999).  In *Pollard*, the Virginia
Supreme Court faced a situation where the parties stipulated that
a property owner intended, by virtue of his sale of the property,
to assign to the purchaser the property owner's agreements with a
leasing agent.  *See id*. at 763.  Even so, there was "no
verification or documentation of any assignment in [the] record."
*See id.* at 763 n.2.  Because there was unquestionably an
assignment with no evidence of limiting language, the court
concluded that it was a complete and total assignment,
transferring all rights and liabilities.  *See id.* at 763-64.

Nevertheless, Virginia law recognizes a distinction
between an absolute transfer of contractual rights and
obligations, which is an "assignment" in a technical legal sense,
and a lesser transfer in which the transferor retains some
interest in the subject matter of the transfer.  *See Kelly Health*

*Care, Inc. v. Prudential Ins. Co. of Am., Inc.*, 309 S.E.2d 305,

307 (Va. 1983).  In distinguishing between the two,

> [t]he intention of the assignor is the controlling
> consideration.  The intent to transfer a present
> ownership of the subject matter of the assignment to the
> assignee must be manifested by some word, written or
> oral, or by some act inconsistent with the assignor's
> remaining as owner.  This has sometimes been called a
> "present appropriation."  The assignor must not retain
> any control over the fund or property assigned, any
> authority to collect, or any form of revocation.

*S.L. Nusbaum & Co. v. Atlantic Va. Realty Corp.*, 146 S.E.2d 205,

210 (Va. 1966).

In the case at bar, unlike *Pollard*, there is language

in the so-called "assignment" that limits the scope of the

transfer.  Although Change Order Number 0007 states that

Dynalectric "agrees to accept assignment" of the Accutronics

Subcontract, that language is immediately followed by

Dynalectric's agreement "to accept and assume all obligations and

responsibilities to [Accutronics] that Centex had under said

Subcontract."  (ACSTAR's Suppl. Mot. for Summ. J., Ex. 12.)

Conspicuously absent is any mention of transfer of Centex's

rights under the Subcontract.  In light of this specific

language, which limited the transfer to Centex's "obligations and

responsibilities" and which omitted any mention of Centex's

rights, the Court cannot conclude that Change Order Number 0007

constituted an assignment of Centex's rights and obligations

under the Subcontract.

-11-

This reading of Change Order Number 0007 and its use of the term "assignment" is consistent with the Accutronics Subcontract itself.  Specifically, Centex and Accutronics agreed in the Subcontract that:

> [O]nce this Subcontract is executed by both parties and the required Payment and Performance Bond are received and accepted, the Subcontract will be assigned to Dynalectric Company - Washington Regional Office for day to day administration.  However, [Centex] reserves the right to also administer any or all of the Subcontract as [Centex] so deems necessary.

(Pl.'s Mot. for Partial Summ. J., Ex. 1-B, Attachment 1, ¶ F(2).) Thus, the Subcontract supports an interpretation of Change Order Number 0007 in which Centex merely assigned responsibilities for day-to-day administration of the Subcontract to Dynalectric.

Furthermore, the affidavits of the parties who actually signed Change Order Number 0007 are in accord with this interpretation.[2]  Paul Mella, Vice-President of Dynalectric and signatory to the Change Order, testified that he and Dynalectric understood the Change Order to transfer certain responsibilities to Dynalectric, but not to be an assignment of Centex's rights

---

[2]Defendants argue that Change Order Number 0007 unambiguously effected a complete assignment of Centex's rights and obligations under the Subcontract and that parol evidence is therefore inadmissible to determine the scope of the Change Order.  Since Defendants were not parties to the Change Order, however, they may not use the parol evidence rule to preclude admission of extrinsic evidence regarding the intent of Centex and Dynalectric.  *See McComb v. McComb*, 307 S.E.2d 877, 879 (Va. 1983) ("[T]he parol evidence rule operates only between the parties to a writing and has no application in a suit involving strangers to the writing nor in a suit involving one party to the writing and a stranger thereto.").  Under *McComb*, the Court may rely on parol evidence to determine the intent underlying the Change Order even if the Court finds the Change Order to be unambiguous.  *See Lemke v. Sears, Roebuck & Co.*, 853 F.2d 253, 255 n.3 (4th Cir. 1988).

under the Subcontract.  (*See* Pl.'s Opp. to Suppl. Mot. for Summ.
J., Ex. 1, ¶¶ 4-5.)  James Anderson, a Project Executive for
Centex and the other signatory to the Change Order, testified
that the Change Order was intended merely to assign day-to-day
responsibilities for administration of the Subcontract to
Dynalectric.  (*See id.*, Ex. 2, ¶ 5.)  Both Mella and Anderson
agreed that Centex retained exclusive authority to approve and
execute change orders to the Accutronics Subcontract and to
declare Accutronics in default, among other things.  (*See id.*,
Ex. 1, ¶ 5; Ex. 2, ¶ 4.)

        The only non-speculative evidence that Defendants have
offered that supports their interpretation of the Change Order is
the deposition testimony of Maria Thompson, a Senior Project
Manager for Centex.  Thompson testified that Centex occasionally
referred to Accutronics as "Dynalectic's subcontractor."
(ACSTAR'S Suppl. Mot. for Summ. J., Ex. 16, at 116-17.)  This
testimony is not inconsistent with Centex's interpretation of the
Change Order and is utterly insufficient to sustain Defendants'
burden on summary judgment.  The plain terms of Change Order
Number 0007, the Accutronics Subcontract, and the testimony of
the signatories to the Change Order all support the notion that
Centex merely transferred responsibilities for day-to-day
administration of the Subcontract to Dynalectric and retained its
rights thereunder.  The Court therefore concludes that Centex did

not effect an assignment of its rights under the Subcontract. *See Edmunds v. CBC Enter., Inc.*, 544 S.E.2d 324, 327 (Va. 2001) ("[I]f the assignor retains any control whatsoever over the fund or property to be assigned, then an assignment has not been effected."). Accordingly, Defendants' supplemental motions for summary judgment will be denied.

   2.  Defendants' Motion for Leave to Withdraw and/or Amend
       Admissions

       On March 29, 2006, Centex served its first set of requests for admissions to both Accutronics and ACSTAR. On April 27, 2006, Defendants served their responses to these requests for admissions. In these responses, Defendants admitted that the documents attached to Centex's requests were true and correct copies of the change orders related to the Accutronics Subcontract, that Accutronics executed each change order, and that each change order increased the amount of the Accutronics Subcontract. Defendants now claim that these admissions were based upon a "mistaken" understanding that Centex had merely assigned day-to-day administration of the Subcontract to Dynalectric. Defendants argue that they recently became aware that Centex assigned the entire Subcontract to Dynalectric and that, as such, they are entitled to withdraw or amend their admissions.

       The Federal Rules of Civil Procedure give the Court discretion to permit withdrawal or amendment of an admission

-14-

where "the preservation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." Fed. R. Civ. P. 36(b).  A party seeking to withdraw or amend its admissions must satisfy both prongs of this test.  *See Harrison Higgins, Inc., v. AT&T Commc'ns, Inc.*, 697 F. Supp. 220, 222 (E.D. Va. 1988).

In this case, Defendants' assertion that they relied on a "mistaken" understanding of Accutronics' relationship with Centex is based on a patently erroneous interpretation of Change Order Number 0007 to the Dynalectric subcontract.  As set forth above, Centex has produced substantial evidence to demonstrate that Change Order Number 0007 merely transferred responsibility for day-to-day administration of the Accutronics Subcontract. This reading of the Change Order is in accord with Defendants' previous interpretation of matters, on which they based their admissions.  As previously stated, the only non-speculative evidence offered by Defendants to support their interpretation is entirely consistent with the weight of the evidence supporting Centex's interpretation of the Change Order.

Accordingly, Defendants' claim that their admissions rested on a mistaken premise is fundamentally meritless.  The Court finds that preservation of the merits of this action will

-15-

not be subserved by permitting Defendants to withdraw or amend their admissions, as their admissions are based on a correct interpretation of Accutronics' relationship with Centex.  As Defendants have failed to establish one of the prongs required by Rule 36(b), their motion for leave to withdraw and/or amend their admissions will be denied.

### 3.  Accutronics' Motion for Leave to File Second Amended Answer and Counterclaim

Based on the same newly discovered evidence, Accutronics seeks leave to file a second amended answer to assert a counterclaim against Centex for *quantum meruit* under a theory of quasi contract.  The Federal Rules of Civil Procedure provide that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment."  Fed. R. Civ. P. 13(f).  Furthermore, "leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).

Based on Defendants' characterization of Change Order Number 0007 as a complete assignment of Centex's rights and obligations under the Subcontract, Accutronics claims that it performed work for Centex without a contractual relationship.  In such circumstances, Virginia law "will imply a promise to pay for goods received" under a quasi-contract theory that "rests 'upon the doctrine that a man shall not be allowed to enrich himself

unjustly at the expense of another.'" *Kern v. Freed Co., Inc.*, 299 S.E.2d 363, 364-65 (Va. 1983) (quoting *Rinehart v. Pirkey*, 101 S.E. 353, 354 (1919)). To establish a claim for *quantum meruit* under Virginia law, Accutronics would have to establish three elements:

> (1) A benefit conferred on the defendant by the plaintiff; (2) Knowledge on the part of the defendant of the conferring of the benefit; and (3) Acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

*Nossen v. Hoy*, 750 F. Supp. 740, 744-45 (E.D. Va. 1990). Even so, Virginia law provides no relief under a *quantum meruit* theory where a valid, express contract exists between the parties. *See Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992). Where the parties have entered into an express contract, they "are entitled to have their rights and duties adjudicated exclusively by its terms." *Vollmar v. CSX Transp., Inc.*, 705 F. Supp. 1154, 1176 (E.D. Va. 1989).

In the case *sub judice*, it is clear that Accutronics remained in a contractual relationship with Centex at all relevant times. As demonstrated above, the evidence overwhelmingly establishes that Change Order Number 0007 merely effected a transfer of responsibility for the day-to-day administration of the Accutronics Subcontract and not, as

Accutronics suggests, a complete assignment of Centex's rights and obligations.  As Centex and Accutronics were in a contractual relationship, any counterclaim asserted by Accutronics for *quantum meruit* would be frivolous.  Finally, the Court notes that this matter is scheduled for trial on September 11, 2006, less than three weeks from now.  For this reason, and because of the frivolousness of any potential counterclaim for *quantum meruit*, the Court concludes that the interests of justice require denial of Accutronics' motion for leave to file a second amended complaint and counterclaim.

B.  The Cross-Motions for Partial Summary Judgment

    1.  The Penal Amount of the Bonds

        Centex's motion for partial summary judgment seeks, *inter alia*, a declaratory judgment establishing the penal amount of the Payment Bond and the Performance Bond.  Both Bonds were issued for the sum of $170,200.00, the original Subcontract amount, but both contained an escalating provision.  Centex claims that, pursuant to these escalating provisions, the penal amount increased with each of the eight additive change orders that it and Accutronics executed.[3]  In all, Centex seeks to establish that the penal amount is presently $2,577,012.00 for each Bond.

---

[3]The additive change orders cumulatively resulted in the addition of $2,406,812.00 to the Subcontract amount.  These change orders were numbered One ($1,500,626), Four ($36,018), Five ($516,327), Six ($34,000), Eight ($137,275), Nine ($102,264), and Ten ($75,000).

Virginia law dictates that surety bonds posted by professional sureties are contractual obligations, subject to the general rules of contract law. *In re Collins*, 173 F.3d 924, 932 (4th Cir. 1999). Virginia contract law "is clear that when an agreement is plain and unambiguous in its terms, it will be given full effect." *McLean House v. Maichak*, 344 S.E.2d 889, 890 (Va. 1986). Where contractual terms are vague or ambiguous, however, the Court will consider extrinsic evidence to interpret the agreement. *Providence Square Assocs., LLC v. G.D.F, Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). Contractual language is ambiguous where it is susceptible to two reasonable interpretations. *See Silicon Image, Inc. v. Genesis Microchip, Inc.*, 271 F. Supp. 2d 840, 850 (E.D. Va. 2003).

In this case, the language that is the subject of the parties' dispute over the penal amount of the Bonds states as follows:

> [A]ny increase in the Subcontract amount shall automatically result in a corresponding increase in the penal amount of the bond without notice to or consent from the Surety, such notice and consent hereby being waived. Decreases in the Subcontract amount shall not, however, reduce the penal amount of the Bond unless specifically provided in said Change Order.[4]

(Pl.'s Mot. for Partial Summ. J., Ex. 1-C; Ex. 1-D.) The Court finds nothing ambiguous about this language. The phrase "any

---

[4] The Subcontract, which was incorporated by reference into both Bonds, contained virtually identical language. (*See* Pl.'s Mot. for Partial Summ. J., Ex. 1-B, General Conditions, ¶ 5(A)(2)).

increase in the Subcontract amount" clearly refers to any and all increases in Centex's subcontract with Accutronics.  Defendants specifically agreed that such increases would be matched by corresponding increases "in the penal amount of the bond without notice to or consent from the Surety."  ACSTAR clearly waived such notice and consent.  Accordingly, the Court finds that the escalation provision is unambiguous.

### i.  Trade Custom and Practice

Even where a contract is clear on its face, Virginia law holds that it may be ambiguous in connection with the business to which it pertains.  *See Walker v. Gateway Milling Co.*, 92 S.E. 826, 828 (Va. 1917).  In this regard, "[e]vidence that contract phrases or terms have acquired, by custom in the locality, or by usage of the trade, a peculiar meaning not attached to them in their ordinary use is admissible" to explain the meaning of contractual terms that appear unambiguous.  *Doswell Ltd. P'ship v. Va. Elec. and Power Co.*, 468 S.E.2d 84, 90 (Va. 1996).

Defendants maintain that evidence of industry custom supports an interpretation that the parties only intended for the escalation and waiver provisions to apply where the increases, modifications, or alterations to the Subcontract were within the Subcontract's general scope.  Defendants rely on the expert report of Richard A. Kowalczyk as evidence of trade custom.

According to Kowalczyk, "[b]y industry custom and practice, there is an expectation that although the surety may agree to waive notice of change orders, the scope of the work, both in contract value and length of performance time, would remain within a reasonable bounds." (Defs' Cross-Mot. for Partial Summ. J., Ex. B-1, at 2.) Kowalczyk further states that "[t]his assumption is critical to the surety's evaluation of the risk. Without an implied limitation that the growth of both scope and time would be reasonable, a surety could not evaluate the risk and in effect would be underwriting a blank check for the subcontractor." (*Id.*, Ex. B-1, at 2-3.)

Even upon assuming the truth of Kowalczyk's analysis of industry custom, Defendants have not provided any admissible evidence that the parties were aware of or intended for their agreements to be interpreted in light of this industry custom. *See Westmoreland-LG&E Partners v. Va. Elec. & Power Co.*, 486 S.E.2d 289, 293 (Va. 1997) (emphasizing that the trade usage at issue must have operated upon the parties' minds when they employed the contractual language). Indeed, the parties' agreement seems to contemplate that all increases in the Subcontract amount would be matched by corresponding increases in the Bonds' penal provisions, without regard to scope or materiality of the change. This is demonstrated not only through

the "any increase" language in the Bonds' escalation provisions,
but also through the broad scope of the Subcontract.

Defendants claim that the Subcontract's general scope
encompassed the mere installation of zone distribution boxes,[5]
but one needs look no further than the Subcontract itself to
determine the actual general scope.[6]  The first page of the
Subcontract describes its "scope" as "Telecommunications System
work as further described herein in strict accordance with the
Contract Documents," to be performed for $170,200, "subject to
additions and deductions for changes in the work as may be agreed
upon."  (Pl.'s Mot. for Partial Summ. J., Ex. 1-B, at 1.)
Attachment 1 to the Subcontract elaborates on the scope, stating
that the Subcontract "includes the furnishing and installation"
of several enumerated items.  (*Id.*, Ex. 1-B, Attach. 1, at 1.)
These enumerated items include furnishing and installation of not
only zone distribution boxes, but also fiberoptic and
telecommunications cabling and splices, telecommunications
cabling and outlets in systems furniture, firestopping inside all
telecommunications sleeves, and so forth.  (*See id.*, Ex. 1-B,
Attach. 1, at 2.)

---

[5]Zone distribution boxes are empty steel boxes that house
telecommunications cabling.

[6]Because the Bonds expressly incorporate the Subcontract by reference,
these documents must be construed together to determine the character and
extent of Defendants' obligations.  See Century Indem. Co. v. Esso Standard
Oil Co., 79 S.E.2d 625, 627 (Va. 1954).

To support their interpretation of the Subcontract's general scope, Defendants have offered the conclusory assertions of Colin Comfort, Vice-President of Accutronics, and Henry Nozko, Head Underwriter for ACSTAR. These affidavits are insufficient to overcome the above-referenced unambiguous, explicit contractual terms. *See Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Defendants have also offered an analysis of the Subcontract's scope, performed by one of their experts, Curtis E. Falany. It is clear, however, that Falany's analysis merely seeks to contradict the Subcontract's scope as expressed in the agreement's plain terms. As such, the analysis must be excluded under the parol evidence rule. *See People's Bank of Rural Retreat v. People's Nat. Bank of Abingdon*, 139 S.E. 325, 327 (Va. 1927) ("If [the agreement] is not ambiguous in its terms it must be construed without the aid of the views of the parties as to it or of their conduct under it.")

Thus, the plain terms of the Subcontract itself demonstrate that the Subcontract is quite broad in its scope. This fact, coupled with the agreed-upon requirement that "*any increase* in the Subcontract amount shall automatically result in a corresponding increase in the penal amount of the bond," (Pl.'s

Mot. for Partial Summ. J., Ex. 1-C; Ex. 1-D (emphasis added)), demonstrates that the parties intended that the materiality of an addition would not be taken into account when adding it to the penal amount.  Defendants have not offered any admissible evidence suggesting that the parties were aware of or intended for their agreements to be governed by the industry customs that Defendants now cite.  Accordingly, Kowalczyk's analysis of industry custom fails to create any ambiguity in the Bonds.

Finally, to further support their claim of textual ambiguity, Defendants argue that Centex's interpretation of the Subcontract and the Bonds would run afoul of established law.  To articulate this established law, Defendants point only to one decision of the New York Supreme Court, Appellate Division, and one decision of the United States District Court for the District of Hawaii.  Regardless, both of the cases cited by Defendants are distinguishable from the case at bar.

In *Success Construction Corp. v. Superintendent of Insurance*, 632 N.Y.S.2d 788 (N.Y. App. Div. 1995), the court confronted a situation in which two change orders issued by a general contractor "materially altered" a subcontract without the consent of the subcontractor's surety.  *See id.* at 789.  The court held that "[u]nder construction contracts specifically making allowances for alterations during the progress of the work, changes not fairly within the contemplation of the parties

-24-

at the time the original contract was made, constituting a material departure from the original undertaking, will therefore release a nonconsenting surety from obligations under its bond." *Id.* In that case, however, the court had direct evidence that the additional work was not contemplated by the original subcontract or the surety bonds. In fact, the additional work that was performed was "specifically excluded under the original contract." *Id.* By contrast, in the instant case, the Subcontract plainly demonstrates that the additional work was within the parties' contemplation. As such, the additional work performed by Accutronics pursuant to the change orders was not a "material departure" from the original agreements and would not release ACSTAR from its bond obligations under the rule articulated in *Success Construction*.

Defendants also cite *United States ex rel. International Business Machines Corp. v. Hartford Fire Insurance Co.*, 112 F. Supp. 2d 1023 (D. Hi. 2000), for the proposition that a surety's obligation "may be absolved by an alteration in the contract between principal and obligee . . . not within the scope of the original contract." *See id.* at 1031. As already stated, however, the contractual alterations in the instant case were within the broad scope of the original Subcontract. Thus, the principle stated in the *IBM* case is inapplicable. Defendants' evidence of trade usage, custom, and "established law" has simply

failed to demonstrate any ambiguity in the Subcontract or the
Bonds.

### ii.  Extrinsic Evidence

Defendants have offered various other items of
extrinsic evidence in support of their interpretation of the
Subcontract, Payment Bond, and Performance Bond.  Among other
things, Defendants rely on two separate letters faxed by
Accutronics' surety agent, BB&T, to Centex on August 5, 2003.  In
the first of these letters, BB&T stated that it was prepared to
issue performance and payment bonds each in the amount of
$170,200.00.  In the second of these letters, BB&T informed
Centex that it was prepared to issue performance and payment
bonds in the amount of $1,500,000.00 in connection with an
unnamed option to be ordered by Centex.  Centex issued no
response to either letter.  Defendants also rely on two separate
letters sent from BB&T to Centex on August 12, 2003.  One of
these letters informed Centex that BB&T was prepared to issue
bonds in the amount of $170,200.00 no later than November 1,
2003, and the second of these letters again informed Centex that
BB&T was prepared to issue a bond in the amount of $1,500,626.00
within fifteen days of an unnamed option being ordered by Centex.
Defendants offer these letters to prove that the parties intended
for the Performance Bond and Payment Bond actually issued to
cover only the original Subcontract amount of $170,200.00.  As

the Court has found the Performance Bond and Payment Bond to be unambiguous, however, the parol evidence rule bars the use of the BB&T letters to interpret those agreements.

It is well established under Virginia law that "where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Iron Constr. Co. v. First Nat'l Bank of Boston*, 140 S.E.2d 629, 633 (Va. 1965). Rather, "the writing is the repository of the final agreement of the parties." *Id.* In other words, "when the language of [an agreement] is 'clear, unambiguous, and explicit,' a court interpreting it 'should look no further than the four corners of the instrument under review.'" *Pyramid Development, L.L.C. v. D&J Assocs.*, 553 S.E.2d 725, 728 (Va. 2001) (quoting *Langman v. Alumni Ass'n of Univ. of Va.*, 442 S.E.2d 669, 674 (Va. 1994)). As such, "[w]here language is unambiguous, it is inappropriate to resort to extrinsic evidence; an unambiguous document should be given its plain meaning." *Great Falls Hardware Co. of Reston v. South Lakes Village Center Assocs., L.P.*, 380 S.E.2d 642, 643 (Va. 1989).

Under these principles, the BB&T letters cannot be considered to shed additional light on the unambiguous provisions of the Performance Bond and Payment Bond. It is important to note that the letters are dated August 5, 2003 and August 12,

2003, approximately two months before the issuance of the
Performance Bond and the Payment Bond.  The Virginia Supreme
Court has been clear that "'parol evidence of *prior or
contemporaneous* oral negotiations or stipulations is inadmissible
to vary, contradict, add to, or explain the terms of a complete,
unambiguous, unconditional, written instrument.'"  *Amos v.
Coffey*, 320 S.E.2d 335, 337 (Va. 1984) (quoting *Godwin v. Kerns*,
17 S.E.2d 410, 412 (Va. 1941)) (emphasis added).

        At the same time, the parol evidence rule "has no
application to subsequent parol agreements between the parties
. . . ."  *Piedmont Mt. Airy Guano Co. v. Buchanan*, 131 S.E. 793,
795 (Va. 1926).  Defendants have cited two pieces of extrinsic
evidence pertaining to conduct and communications that occurred
after the execution of the Performance Bond and Payment Bond.
First, on February 4, 2005, ACSTAR sent to Centex an inquiry form
seeking a status report on the Project's progress.  Although
ACSTAR made this inquiry after Change Order One was executed,
thereby adding $1,500,626.00 to the Subcontract amount, ACSTAR's
status report form listed the bond amount as $170,200.00.  Centex
never responded to the inquiry and never indicated that it
acquiesced to ACSTAR's understanding of the bond amount.  As
such, the February 4, 2005 inquiry form merely serves to
illustrate the interpretive gloss that ACSTAR unilaterally placed
on the Bonds and is not evidence of a "subsequent parol

agreement[] between the parties," in the words of the *Piedmont*
court.  *See* 131 S.E. at 795.  For this reason, the Court will not
consider it.

Second, Defendants argue that the parties' conduct with
respect to bond premiums demonstrates their intent that bonds for
any additive change orders be separately underwritten.
Defendants point out that Accutronics paid, and ACSTAR received,
a bond premium in the amount of $4,681.00 for the original
issuance of the Performance Bond and Payment Bond.  Defendants
contrast this payment with the parties' subsequent conduct,
claiming: (1) that some of Accutronics' change order proposals
did not include bond premiums; and (2) that Accutronics never
actually paid bond premiums to ACSTAR or BB&T for any of the
additive change orders.  With respect to the first issue, it is
undisputed that Accutronics' proposals for Change Orders One and
Eight included amounts allocated for bond premiums.  In light of
this fact, the omission of bond premiums from the remainder of
Accutronics' proposals is a poor indication of the parties'
intent.  With respect to the second issue, Centex has offered
uncontroverted evidence to establish that Accutronics billed
Centex and Dynalectric for bond premiums in connection with
several of the change orders.  Thus, the Court can only assume
that Accutronics billed Centex and Dynalectric for bond premiums
that ACSTAR never actually received from Accutronics.  The fact

-29-

that Accutronics failed to turn these premiums over to ACSTAR has
no bearing on the proper interpretation of the Bonds or the
parties' intent under those agreements.

### iii.  Conclusion

On a motion for summary judgment, if the court properly
determines that the contract is unambiguous, then no interpretive
facts are in genuine issue, and the court may interpret the
contract as a matter of law and grant summary judgment.  *World-
Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 245 (4th
Cir. 1992).  In this case, the escalation provisions of the Bonds
unambiguously provided that the penal amounts of the Performance
Bond and Payment Bond would increase with each additive change
order executed by Centex and Accutronics.  Defendants have failed
to provide any admissible evidence suggesting why these
escalation provisions should not be given their plain meaning.
Accordingly, the Court will grant Centex's motion for partial
summary judgment insofar as it seeks to establish the penal
amount of the Bonds at $2,577,012.00.

### 2.  Affirmative Defenses

Centex's motion for partial summary judgment also
requests this Court to enter a judgment declaring that Defendants
waived their affirmative defense of discharge based on a material
alteration of the bond risk.  Defendants, for their part, seek a
partial summary judgment establishing the discharge affirmative

-30-

defense as well as three others.  Finally, Centex also seeks a judgment declaring that Defendants have a duty to defend, indemnify, and hold Centex and Travelers harmless from the claims of any of Accutronics' suppliers.  As the Court will discuss below, although Centex is entitled to summary judgment on the discharge affirmative defense, disputed issues of material fact remain with respect to the other affirmative defenses. Accordingly, summary judgment is inappropriate at this time with respect to Defendants' duty to defend, indemnify, and hold Centex and Travelers harmless.

### i.  Discharge Based on Material Alteration of Risk

ACSTAR claims that its obligations under the Performance Bond and Payment Bond were discharged because of a material alteration of its bond risk.  Centex argues that ACSTAR voluntarily and intentionally waived the discharge defense.  Both ACSTAR and Centex seek summary judgment in their favor with respect to this affirmative defense.

Under Virginia law, a surety's bond obligation may be discharged by a modification to a construction contract that materially increases the surety's risk without the surety's knowledge or consent.  *See Southwood Builders, Inc. v. Peerless Ins. Co.*, 366 S.E.2d 104, 107-08 (Va. 1988).  The surety need not demonstrate prejudice resulting from the material alteration because the material alteration, in itself, establishes

-31-

sufficient prejudice.  *Id.*  It is also well-settled that "[t]he surety may waive its rights, or consent to the underlying agreement being altered or modified, and the general rule calling for the discharge of the surety does not apply where the suretyship or guaranty agreement itself permits the modification of the underlying obligation."  23 Richard A. Lord, Williston on Contracts § 61:31 (4th ed. 2000).  Virginia law dictates that such waiver be performed voluntarily and intentionally.  *See Bergmueller v. Minnick*, 383 S.E.2d 722, 725 (Va. 1989) ("[Waiver] has two essential elements: (1) knowledge of the facts basic to the exercise of the right, and (2) the intent to relinquish that right.").

In the present case, the language of the Bonds clearly and unequivocally demonstrates that ACSTAR waived its right to the discharge defense.  Both of the Bonds expressly state:

> [A]ny alterations which may be made in the terms of the Subcontract or in the work to be done under it, or the giving by the General Contractor of any extension of time for the performance of the Subcontract, or any other forbearance on the part of either the General Contractor or the Subcontractor to the other shall not in any way release the Subcontractor and the Surety, or either of them . . . from their liability hereunder, notice to the Surety of any such alteration, extension or forbearance being hereby waived.

(Pl.'s Mot. for Partial Summ. J., Ex. 1-C; Ex. 1-D.)  The Subcontract, which both of the Bonds incorporated by reference, contained similar language providing that:

> No change, alteration or modification in or deviations
> from this Agreement or the Contract Documents shall
> release or exonerate in whole or in part any Surety on
> any bond given in connection with this Agreement.
> Neither Owner nor Contractor shall be under any
> obligation to notify the Surety or Sureties of any such
> change.

(*Id.*, Ex. 1-B, General Conditions, ¶ 5(A)(2).)  By all

indications, ACSTAR executed the Performance and Payment Bonds

knowingly and voluntarily.  As stated in section (B)(1) of this

Opinion, moreover, ACSTAR has failed to provide any admissible

extrinsic evidence to suggest that the parties did not intend to

give these waiver provisions their plain meaning.  Accordingly,

the Court concludes that ACSTAR waived its defense of discharge

based on material alteration of its bond risk.  The Court will

grant Centex's motion and deny ACSTAR's motion for summary

judgment with respect to this affirmative defense.

> ii.  The "First Breach" Rule[7]

As a general rule, a party who commits the first

material breach of a contract is not entitled to enforce the

contract.  *Horton v. Horton*, 487 S.E.2d 200, 203 (Va. 1997).

Accutronics argues that Centex breached the Subcontract first by:

(1) denying Accutronics its entitlement to time extensions; and

(2) ordering Accutronics to perform work that constituted

---

[7]As a procedural matter, only the Defendants have moved for summary
judgment with respect to the "first breach" affirmative defenses, as well as
the fraudulent concealment affirmative defense that follows.  As such, the
Court's discussion will be confined to whether Defendants have presented
undisputed material facts in support of their argument.

"cardinal changes" to the Subcontract.  As such, Accutronics seeks to preclude Centex from enforcing the terms of the Subcontract and the Bonds.  Similarly, ACSTAR seeks a discharge of its Bond obligations because of Centex's alleged material breaches of the Subcontract.  ACSTAR's argument is based on the settled principle that a surety defending an obligee's claim on the bonded obligation stands in the principal's shoes and may assert the defenses available to the principal.  *See Bd. of Supervisors of Fairfax County v. S. Cross Coal Corp.*, 380 S.E.2d 636, 639 (Va. 1989).  Defendants jointly seek summary judgment with respect to both claims of material breach of the Subcontract.

### a.  Accutronics' Entitlement to Time Extensions

The Subcontract contained the following provision pertaining to the circumstances under which Accutronics would receive time extensions for its performance:

> Should Subcontractor's performance of this Agreement be delayed or disrupted by any acts of Contractor, other Subcontractors, or Contractor's Suppliers, or delayed or disrupted by any acts or causes which would entitle Contractor to an extension of time under the Contract documents, Subcontractor shall receive an equitable extension of time for the performance of this Agreement . . . .

(Pl.'s Mot. for Partial Summ. J., Ex 1-B, General Conditions, ¶ 3(E).)  According to Colin Comfort's affidavit, Accutronics anticipated beginning its base Subcontract work no later than the fall of 2004.  Comfort testifies that delays in the work of other

-34-

trade subcontractors prevented Accutronics from obtaining access to the B2 basement area of the Project, where nearly half of Accutronics' work was to be performed.  Comfort claims that Accutronics requested time extensions from Dynalectric, which, in turn, corresponded with Centex regarding the delays.  He asserts that despite these requests, Centex refused to grant any time extensions.  According to Comfort, Accutronics was unable to access any portion of its base Subcontract work until February 2005 and did not receive full access to the work areas relating to the change orders until approximately May 2005.

Defendants argue that Centex's refusal to grant a time extension to Accutronics under these circumstances constituted a material breach of Paragraph 3(E) of the Subcontract.  They have failed, however, to demonstrate the absence of genuine disputes of material fact on this issue.  Centex has cited various pieces of evidence to refute Comfort's account, mainly pertaining to the notice of delay given to Centex by Accutronics.  Most relevant for purposes of this motion is the fact that Comfort himself testified in his deposition as to his authorship of a document stating that Accutronics' work "continued without problems and on schedule to meet the September deadline until July 2005."  (Pl.'s Opp. to Cross Mot. for Partial Summ. J., Ex. 12, at 144.)  This prior testimony casts doubt over the account given by Comfort in his affidavit and certainly creates a triable issue of material

fact with respect to whether Centex breached Paragraph 3(E) of the Subcontract.  Accordingly, the Court will deny Defendant's motion with respect to this affirmative defense.

### b.  "Cardinal Changes" to the Subcontract

Defendants also argue that Centex committed material breaches of the Subcontract by ordering Accutronics to perform additional work that constituted "cardinal changes" to the agreement.  Defendants have not cited any authority holding that the cardinal change doctrine applies outside of the federal government contract law context,[8] and the Court's own research has yielded no Virginia law suggesting that a "cardinal change" amounts to a breach of an agreement between private parties. Even upon assuming the application of the cardinal change doctrine to this subcontractor/general contractor dispute,

---

[8]Defendants cite *Aetna Casualty and Surety Co. v. LFO Construction Co.*, 207 A.D.2d 274 (N.Y. App. Div. 1994), and *Employers Insurance of Wausau v. Construction Management Engineers of Florida, Inc.*, 377 S.E.2d 119 (S.C. 1989), in support of their "cardinal change" theory.  Both of these decisions represent unremarkable applications of the discharge defense that a surety can assert when its bond risk has been materially altered.  *See Aetna Cas. & Surety Co.*, 207 A.D.2d at 277; *Employers Ins. of Wausau*, 377 S.E.2d at 121-22. For obvious reasons, ACSTAR is the only Defendant that could assert this defense, and in any event, the Court has concluded as a matter of law that ACSTAR waived this defense.

Defendants also cite *Westinghouse Electric Corp. v. Garrett Corp.*, 437 F. Supp. 1301 (D. Md. 1977), in support of their "cardinal change" defense. The *Westinghouse* court actually did discuss the cardinal change doctrine and, like the case at bar, dealt with a dispute between a prime contractor and a subcontractor.  In *Westinghouse*, however, the contract at issue contained a changes clause derived from the Armed Services Procurement Regulations and thus implicitly incorporated the cardinal change doctrine.  *See id.* at 1332. The court's application of the cardinal change doctrine is therefore inapposite to the instant case.

however, the Court concludes that Defendants are unentitled to summary judgment on this affirmative defense.

The United States Court of Claims has defined a "cardinal change" as "an alteration in the work so drastic that it effectively requires the contractor to perform duties material[ly] different from those originally bargained for." *Allied Materials & Equip. Co., Inc. v. United States*, 569 F.2d 562, 563-564 (Ct. Cl. 1978). Analysis of whether a cardinal change occurred requires consideration of both the magnitude and the quality of the changes. *See Saddler v. United States*, 287 F.2d 411, 413 (Ct. Cl. 1961). A cardinal change constitutes a breach of the agreement. *Allied Materials & Equip. Co.*, 569 F.2d at 564.

Defendants argue that the change orders issued by Centex constituted cardinal changes in terms of both the magnitude and the quality of the changes. Defendants cite the fact that the change orders increased the value of the Subcontract from $170,200.00 to $2,577,012.00. Defendants also argue that the change orders altered Accutronics' scope of work under the Subcontract, from the relatively simple installation of metal zone distribution boxes to the installation of an entire fiberoptic telecommunications system. As the Court has already concluded, however, the Subcontract contemplated a scope of work that was much broader than the mere installation of zone

-37-

distribution boxes.  Rather, the Subcontract's scope encompassed work such as the installation of fiberoptic and telecommunications cabling and included a $1,500,626 option that was priced by Accutronics itself.  Defendants have not pointed to any undisputed material fact that would suggest otherwise, and they are therefore not entitled to summary judgment on the cardinal change defense.

Furthermore, the Court of Federal Claims has recognized that a cardinal change claim can be waived where the non-breaching party continues to perform after the occurrence of the cardinal change.  *See Becho, Inc. v. United States*, 47 Fed. Cl. 595, 604-05 (2000).[9]  The non-breaching party's continued performance does not alone establish a waiver of the right to declare a breach because of a cardinal change.  *See Allied Materials & Equip. Co.*, 569 F.2d at 564 ("Undoubtedly, the cautious contractor might often proceed under the revised contract because of doubt whether he could invoke the cardinal change doctrine.").  Virginia law, were it to incorporate the cardinal change doctrine and its waiver exception, would require the waiver to be voluntary, knowing, and intentional.  *See Bergmueller*, 383 S.E.2d at 725.

---

[9]Defendants point out that Centex cites only federal government contract cases in support of this waiver theory, suggesting that this fact detracts from the theory's persuasive value.  Given that the "cardinal change" doctrine itself is a creature of federal government contract law and that Defendants have cited only federal government contract cases in support of the doctrine, the Court finds Defendants' argument meritless.

-38-

In this case, Centex has argued that Accutronics'
continued performance under the Subcontract constituted a waiver.
Defendants have not demonstrated the absence of genuine disputes
of material fact with respect to Centex's characterization of the
continued performance.  For this additional reason, the Court
will deny Defendants' summary judgment motion as to their
cardinal change defense.

### iii.  Fraudulent Concealment

Finally, ACSTAR argues that Centex failed to disclose
facts that were material to ACSTAR's underwriting decision,
thereby discharging ACSTAR from liability under the Bonds.
ACSTAR relies exclusively on New York law providing sureties with
an affirmative defense for an obligee's concealment of a material
fact in the following circumstances:

> 1) the obligee must know facts that materially increase
> the surety's risk, and have reason to believe that surety
> would be unwilling to assume such a higher risk; 2) the
> obligee must have reason to believe that such facts are
> unknown to the surety; 3) the obligee must have the
> opportunity to communicate the relevant information to
> surety; and 4) the obligee must have the duty to disclose
> the information based upon its relationship to the
> surety, its responsibility for the surety's misimpression
> or other circumstances.

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 905 F. Supp. 95, 97
(E.D.N.Y. 1995) (applying New York law).  Furthermore, "[w]hen a
surety does request information from an obligee, silence on the
part of the obligee can amount to fraudulent concealment."

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d

Cir. 1995) (applying New York law).

      Of course, the instant dispute is governed by Virginia

law, and Defendants have again failed to demonstrate that the

courts of Virginia would recognize this defense.  As such, the

Court will also look to the Virginia Supreme Court's guidance

with respect to fraudulent concealment claims.  In *Spence v.*

*Griffin*, 372 S.E.2d 595 (Va. 1988), the court stated:

> Concealment of a material fact by one who knows that the
> other party is acting upon the assumption that the fact
> does not exist constitutes actionable fraud.  For
> purposes of an action for fraud, concealment, whether
> accomplished by word or conduct, may be the equivalent of
> a false representation, because concealment always
> involves deliberate nondisclosure designed to prevent
> another from learning the truth.  A contracting party's
> willful nondisclosure of a material fact that he knows is
> unknown to the other party may evince an intent to
> practice actual fraud.

*Id.* at 598-99 (internal quotation marks and citation omitted).

As always, "[t]he burden is upon the party charging fraud to

prove it by clear and convincing evidence."  *Id.* at 598.

      ACSTAR argues that the August 2003 BB&T letters, which

informed Centex that BB&T was prepared to issue a separate bond

upon Centex's exercise of an unnamed option, suffice to meet each

element of the New York fraudulent concealment defense.

Specifically, ACSTAR claims that the letters put Centex on notice

that ACSTAR would be unwilling to assume a higher risk under the

then-existing Bonds, gave Centex reason to believe that ACSTAR

was unaware of the extent of its bond risk, and presented Centex
with an opportunity to disabuse ACSTAR of its mistaken notion.

A cursory review of the text of the BB&T letters
reveals that the letters cannot sustain the weight that ACSTAR
attributes to them.  The first letter, dated August 5, 2003,
merely states that BB&T, as Accutronics' surety agent, was
prepared to issue a performance and payment bond in the amount of
$170,200 for the Project.  The second letter, also dated August
5, 2003, informs Centex that BB&T was prepared to issue a
performance and payment bond "in the approximate amount of
$1,500,000 for [the Project] within 45 to 60 days from the date
of the option being ordered by Centex."  (Defs' Cross-Mot. for
Partial Summ. J., Ex. C-3.)  The letter went on to state:

> It is our understanding that this phase of the project
> will commence after the first of the year.  Of course,
> our approval of the issuance of this bond is subject to
> the prevailing underwriting conditions at the time of the
> request.

(*Id.*)  The third and fourth letters, both dated August 12, 2003,
contain substantially similar language.

While the propositions set forth by ACSTAR could have
been inferred from these letters, the letters were not a model of
clarity.  If ACSTAR did believe that its risk under the Bonds was
limited to the original Subcontract amount, the letters alone did
not set forth this belief clearly enough to place Centex on
notice that ACSTAR was unaware of its bond risk and unwilling to

-41-

assume a higher risk under the then-existing Bonds.  Certainly,
the letters do not constitute clear and convincing evidence of
"[a] contracting party's willful nondisclosure of a material fact
that he *knows* is unknown to the other party," as required by
Virginia law.  *See Spence*, 372 S.E.2d at 599 (emphasis added).
Absent clear and convincing proof of Centex's possible knowledge
of ACSTAR's interpretation of the Bonds, the Court will deny
ACSTAR's summary judgment motion with respect to its fraudulent
concealment defense.

## IV.  Conclusion

        For the foregoing reasons, the Court will grant
Defendants' motion for leave to file supplemental motions for
summary judgment, deny Defendants' supplemental motions for
summary judgment, deny Defendants' motion for leave to withdraw
and/or amend their admissions, and deny Defendant Accutronics'
motion for leave to file a second amended answer and
counterclaim.  The Court will also grant Plaintiff's motion for
partial summary judgment to the extent it seeks to establish the
penal amount of the Performance Bond and Payment Bond, grant the
same motion insofar as it seeks judgment on ACSTAR's discharge
affirmative defense, and deny the motion as to the remainder of
the relief requested by Plaintiff.  Furthermore, the Court will
deny Defendants' cross-motion for partial summary judgment.
Finally, the Court will not separately address the parties'

motions to strike but will grant Plaintiff's motion to strike to the extent indicated above and will deny Defendants' cross-motion to strike.  An appropriate Order will issue.


August 24, 2006                    _____/s/_____
Alexandria, Virginia                        James C. Cacheris
                                   UNITED STATES DISTRICT COURT JUDGE